DECISION
Christine and Raymond Jones ("Plaintiffs" or "the Joneses") seek to quiet title to certain disputed real estate owned by Anne and Lewis Perrotti ("Defendants" or "the Perrottis") under a theory of adverse possession as codified in G.L. 1956 § 34-7-1. Alternatively, Plaintiffs seek to establish an expanded boundary to their undisputed property — to include the disputed, adjacent real estate — based on the doctrine of acquiescence. Jurisdiction is pursuant to G.L. 1956 § 8-2-14.
 Facts and Travel
"Based on the evidence adduced at a non-jury trial, the Court makes the following findings of fact, which in large part are not in dispute and have been stipulated to by the parties. Plaintiffs own and reside at 112 Killingly Street ("the Adjacent Lot"), known as Lot 7 on Assessor's Plat 111, in Providence, Rhode Island. The Joneses' home is on the southern side of Killingly Street, which runs approximately east-west. The Joneses have lived at the Adjacent Lot since 1999, when they purchased it from the estate of the *Page 2 
previous owner, Allen Gardiner.[1] (Plaintiffs' Exhibit 1 — Parties' Stipulation of Facts ("Stip.") ¶ 1(d); Ex. 5.) Allen Gardiner, in turn, had owned the land as a joint tenant with his father, Wayland Gardiner, who had purchased the land in 1961. (Stip. ¶ 1(a), 1(c); Pl. Ex. 2; Pl. Ex. 4.)
Defendants own the real estate bordering Plaintiffs' Lot 7 on the east, having purchased it from the City of Providence in 1975. (Stip. ¶ 1(b); Pl. Ex. 3.) That sale constituted a carve-out by the City from public space known as Lot 3 on Assessor's Plat 111, and Defendants' carved-out portion became Lot 82. (Pl. Ex. 3; Pl. Ex. 10.) In 2005, intending to develop each for a profit, Mr. Perrotti subdivided Lot 82 into three separate lots — now known, from west to east, as Lots 99, 100, and 101 on Plat 111. (Stip. ¶ 1(b); Pl. Ex. 8.) Thus, Lot 99 borders the eastern edge of Plaintiff's lot and the parties' conflicting claims to a substantial westerly portion of Lot 99 are at the heart of this dispute.
Lot 99 is trapezoidal in shape, as its western border meets Killingly Street at an acute angle. At some unknown time prior to Defendants' 1975 purchase, an unknown party constructed a chain link fence approximately perpendicular to Killingly Street, running from the street to the back of what is now Lot 99. (Stip. ¶ 5; Pl. Ex. 8.) The fence runs the full depth of the Lot, approximately 97 feet, and is the eastern edge of a smaller trapezoid within the trapezoidal Lot 99. To the east of the fence is the small remainder of Lot 99, a long and slender near-rectangle approximately 97 feet deep, 13 *Page 3 
feet wide at the street, and 15 feet wide at the back of the Lot. The smaller trapezoid to the west of the fence — "the Disputed Land" — is today a 4,765 square foot manicured lawn.
The use of what is now Lot 99 over the past four decades is not seriously disputed. The parties stipulate that a lawn bowling organization used the land for some time, but had disbanded by the 1975 purchase of the land by Defendants. (Stip. ¶ 5.) It is further stipulated that, "[f]rom 1975 to the present, the Disputed Land has been exclusively and continuously used and maintained as a recreational area by the parties in possession of 112 Killingly Street." (Stip. ¶ 6.) At some date after 1975, the Disputed Land was closed off when another chain link fence was installed, again by an unknown party, along the back of the Lot, parallel to the street and meeting the earlier chain link fence so that access to the Disputed Land is now restricted to the Adjacent Lot. Plaintiffs' trial exhibits and testimony demonstrated extensive use and activity on the Disputed Land since their 1999 purchase of 112 Killingly Street, including an above-ground swimming pool; installing a Celtic stone to commemorate their wedding, which was held partly on the Disputed Land; installing a horseshoe pit; holding cook-outs; and keeping various lawn and sporting goods on the ground for lengthy periods. (Pl. Ex. 9.) Two separate surveys of the area indicate that the Disputed Land has been maintained as a manicured lawn while, on the other side of the chain link fence, all of the previous Lot 82 was a wooded and unimproved area until Mr. Perrotti began his development in 2005. (Pl. Ex. 8; Pl. Ex. 10.) Plaintiffs never asked permission of anyone before engaging in these activities, as they mistakenly believed the Disputed Land was included in their deed for the Adjacent Lot and included in the property taxes they were paying thereon. *Page 4 
In fact, as the parties stipulate, the Perrottis have paid all taxes on the Disputed Land, along with the rest of the former Lot 82, since their 1975 purchase. (Stip. ¶ 7.) Mr. Perrotti testified that he has always been fully aware of the limits of his property, having walked the full length of the lot boundaries before and after his 1975 purchase. He did not view the chain link fence as a boundary to his lot, but rather believed it was a remnant of a viewing area utilized by the lawn bowling organization. It is Mr. Perrotti's further contention that the years of use of the Disputed Land by his westerly neighbors arose out of a conversation he had with Wayland Gardiner, then the owner of the Adjacent Lot and now deceased, shortly after the purchase. Mr. Perrotti testified that he gave Mr. Gardiner express permission to use the portion of the yard west of the chain link fence until he, Perrotti, was ready to develop the Lot. Mr. Perrotti's father, now deceased, was also present for this alleged conversation. Mr. Perrotti admits that no writing memorializing this license was created. Nor did he speak with the subsequent owners of 112 Killingly Street — first Alan Gardiner and, subsequently, the Plaintiffs; in fact, his testimony was that in 2005, ready to develop Lot 99, he went looking for Wayland Gardiner to rescind the permission he had given.
 Law and Analysis
The law of adverse possession is codified in G.L. 1956 § 34-7-1:
 Where any person or persons, or others from whom he, she, or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, the actual seisin and possession shall be allowed to give and make a good and rightful title to the person or persons, their heirs and assigns forever; and any plaintiff suing for the recovery of any such lands may rely upon the possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall *Page 5 
be brought for the lands, tenements or hereditaments, and the actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring the action.
A claimant seeking to clear title and establish adverse possession of property must demonstrate possession of the property for at least ten years that is "actual, open, notorious, hostile, under claim of right, continuous, and exclusive." Tavares v. Beck, 814 A.2d 346, 350 (R.I. 2003) (quoting Sherman v. Goloskie, 95 R.I. 457, 465, 188 A.2d 79, 83, 188 A.2d 370 (1963)). "The party claiming adverse possession must establish each of these elements by `strict proof, that is, proof by clear and convincing evidence.'" Id. (quoting Carnevale v. Dupee,783 A.2d 404, 409 (R.I. 2001)). In the present case, several of the above elements are not in dispute. Possession for ten years
In order to meet the statutory period of ten years, claimants may "tack on the period of possession of [their] predecessor from whom [they] derived title." Tavares, 814 A.2d. at 350 (quotingCarnevale, 783 A.2d at 412). In this case, although the Plaintiffs have only owned the Adjacent Lot since 1999, the parties have stipulated that the Gardiner family, the Joneses' predecessors in title, used and maintained the Disputed Land in the same way as the Joneses from 1975 until the 1999 sale. (Stip. ¶ 6.) Thus, Plaintiffs have shown, by clear and convincing evidence, that the use and possession on which they base their claim has existed for the requisite ten-year period.Exclusive and Continuous Possession
The facts in this case demonstrate that the use and possession by the Joneses and, before them, the Gardiners, has been exclusive and continuous. The Disputed Property has been fenced off to allow access only through the 112 Killingly Street property, the *Page 6 
occupants of which have used it as an extension of their own yard for various activities throughout the years. The parties have stipulated that the two families at 112 Killingly Street have "exclusively and continuously used and maintained the Disputed Land" since 1975. (Stip. ¶ 6.) Thus, Plaintiffs have shown the elements of exclusivity and continuity by clear and convincing evidence.
Actual, Open, and Notorious Possession
The requirement that possession be open and notorious ensures that a claimant cannot "mask his intent and then acquire the property by concealing the true situation from the record owner." Tavares,814 A.2d at 352 (quoting Picerne v. Sylvestre, 122 R.I. 85, 91-92, 404 A.2d 476,479-80 (1979)). "Thus, to establish adverse possession, claimants must show that their use of the land was sufficiently open and notorious to put a reasonable property owner on notice of their hostile claim."Id. (citing Anthony v. Searle, 681 A.2d 892, 897 (R.I. 1996)). Putting the record owner on notice in turn requires that "`the use to which the land has been put is similar to that which would be made ordinarily of like land by the owners thereof,' considering the `character and locality [of the subject land], and the uses and purposes for which it is naturally adapted.'" Id. (quoting Sherman, 95 R.I. at 466,188 A.2d at 84) (modifications by Court; internal citation omitted). Although not essential, the visibility of an adverse use from a public street is a factor tending to show that use is open and notorious. Id. at 354.
The element of actual possession is similar to open and notorious possession, requiring "an actual use and enjoyment of the property that is in kind and degree the same as the use and enjoyment to be expected of the average owner of such property." Emerson v. Maine Rural MissionsAss'n, 560 A.2d 1, 2 (Me. 1989) (citing Howe v. *Page 7 Natale, 451 A.2d 1198, 1200 (Me. 1982)). The element also acts to protect the title owner by requiring physical possession, not "mere mental enclosure of the land," in order to establish adverse possession. 16 Powell on Real Property, § 91.03 at 91-15 (2000) (citing Payne v.Payne, 728 S.W.2d 635, 639 (Mo.Ct.App. 1987)).
The testimony and evidence presented at trial indicate that Plaintiffs and their predecessors at the Adjacent Lot have treated the Disputed Land as an extension of their own yard and used it as would its title owner. Killingly Street runs through a residential neighborhood, and the Disputed Land has been maintained as a manicured lawn by the possessors of the Adjacent Lot. Trial testimony indicates that over four decades, neighborhood children have played on the lawn, a swimming pool and playset have been set up by Plaintiffs, and Plaintiffs have also had cookouts and their wedding reception on the property. These activities have all been in plain view from Killingly Street. The Court finds that Plaintiffs have demonstrated, by clear and convincing evidence, that their use and possession, as well as that of their predecessors, has been actual, open, and notorious.
Hostile Possession under a Claim of Right
The final two elements of adverse possession are best analyzed simultaneously, for, "[i]n essence, to require adverse possession under a claim of right is the same as requiring hostility, in that both terms simply indicate that the claimant is holding the property with an intent that is adverse to the interests of the true owner." Tavares,814 A.2d at 351 (quoting 16 Powell on Real Property, § 91.05[1] at 91-23)). The requirement of a claim of right should not be mistaken with color of title, as the former requires no good faith belief of ownership by the possessor, only "evidence of open, visible acts or *Page 8 
declarations, accompanied by use of the property in an objectively observable manner that is inconsistent with the rights of the record owner." Id. Likewise, "to constitute a hostile use, the adverse possessor need only establish a use `inconsistent with the right of the owner, without permission asked or given,. . . such as would entitle the owner to a cause of action against the intruder [for trespass]."Id. (quoting 16 Powell at 91-23) (emphasis added; ellipsis and bracket in original). Despite the fact that the party seeking to clear title by adverse possession bears the burden of proof as to each element, establishing that the use is "inconsistent with the right of the owner" does not require the proof of a negative — that the use was not permissive. If the use is open, notorious, and continuous for the full statutory period, hostility is presumed. See Robarge v. Willett, 224 A.D.2d 746 (N.Y.App.Div. 1996). It is then the burden of the title owner of the disputed property to refute the presumption by showing the use was permissive. 16 Powell on Real Property, § 91.13 at 91-90. On the other hand, if the first use is shown to have been permissive, a presumption arises that any continuing use is also permissive.Martineau v. King, 120 R.I. 265, 269, 386 A.2d 1117, 1119 (1978).
Having demonstrated well over ten years of continuous, exclusive, actual, open, and notorious possession, Plaintiffs' claim of adverse possession rises or falls with the requirements of hostility and a claim of right. Although Defendants have stipulated to some of the above elements and failed to present evidence contesting others, they vigorously argue that the use and possession of the Disputed Land since 1975 has been permissive, defeating the requirement of hostility and, with it, Plaintiffs' claim of adverse possession. Plaintiffs seek to discredit Mr. Perrotti's testimony as self-serving, motivated by profit, and incredible in light of the evidence in the case. *Page 9 
Mrs. Jones' testimony was most compelling. With respect to the period since Plaintiffs' 1999 ownership of the Property, the evidence clearly and convincingly demonstrates that possession has been hostile and under a claim of right. Mrs. Jones testified she had never met or spoken to the Gardiners. She testified that she believed her property included the disputed land based upon the representations made by attorney John Ennis, the executor of Allen Gardiner's estate who had shown her the property prior to her purchase. Mr. Ennis walked Plaintiff around the exterior of the property, and Plaintiff assumed, not surprisingly, that what she was being shown was what was available for purchase. Mr. Ennis testified, on the other hand, that he would not have shown the boundary lines because he really did not know them. It is absolutely clear to the Court that Mr. Ennis and Mrs. Jones were not having an informed conversation. Whether Mr. Ennis knew the specifics of the boundary lines or not, he showed Mrs. Jones around a piece of property that she quite naturally assumed was the property for purchase. There was no reason for her to think anything else. She was, and continued to be, in the dark based, inter alia, upon the misrepresentations and/or silence of others. In the ensuing years, Mrs. Jones believed, incorrectly, that she was paying taxes on the disputed property. Furthermore, she and her family did not ask permission to put the swimming pool in their yard years ago, to cut down trees, to hang a swing, carve out a horseshoe pit, or set stones in the yard. No one ever questioned these activities as they occurred over many years.
None of the other witnesses' testimony was as clear, compelling and credible as Plaintiff's. Mr. Perrotti testified regarding an alleged conversation he had with Wayland Gardiner, then the owner of the Adjacent Lot, shortly after Mr. Perrotti's 1975 purchase. *Page 10 
Mr. Perrotti argues that during that conversation, he granted Wayland Gardiner permission to continue use of the land and that the subsequent possession has, therefore, not been hostile and under claim of right. No corroboration of this testimony was offered, as Wayland Gardiner and Mr. Perrotti's father, also present for the alleged conversation, are deceased and Mr. Perrotti admits no writing was created to memorialize the alleged license. Furthermore, the totality of evidence presented at trial does not support Mr. Perrotti's testimony. Where one grants a license for another's use of his land, it is reasonable to expect some concern for the activities occurring thereon, as well as, at a minimum, some effort to recoup costs incurred, if not to charge a fee. Here, the evidence has shown that during years in which Mr. Perrotti lived nearby and in view of the Disputed Land, a swimming pool and swing were frequented by neighborhood children. No evidence was presented that would tend to show any concern on Mr. Perrotti's part regarding these or other activities. Additionally, while the owners of the Adjacent Lot enjoyed the benefits of exclusive possession and use of the Disputed Land, it was Mr. Perrotti who paid the taxes thereon with his annual assessment without any subsequent attempt to recover such taxes. On the evidence before it, this Court is not persuaded that Wayland Gardiner was granted permission for his use of the Disputed Land. The Court instead finds, based on the clear and convincing evidence presented, that for the entire statutory period of ten years, the possession of the Disputed Land by Plaintiffs and their predecessors in title has been hostile and under claim of right.
 Conclusion
The Court has found that Plaintiffs and their predecessors in title, for a period exceeding ten years, have been in possession of the Disputed Land that has been "actual, *Page 11 
open, notorious, hostile, under claim of right, continuous, and exclusive." Tavares, 814 A.2d at 350. Finding Plaintiffs have demonstrated each of these elements by clear and convincing evidence, the Court enters judgment in favor of Plaintiffs based on their claim of adverse possession. Plaintiffs' alternative theory based on the Doctrine of Acquiescence is therefore rendered moot and need not be addressed.
Counsel shall submit the appropriate Order for entry.
[1] In 1999, Ms. Jones was known as Christine Anderson and owned the home jointly with Michael Anderson. (Stip. ¶ 1(d).) For clarity, her present name is used throughout this Decision. Additionally, the Court notes that the parties have stipulated to subsequent transfers of the land in 2001 from Ms. Jones and Mr. Anderson to Ms. Jones as sole owner, and again as sole owner to herself and Mr. Jones as joint tenants with right of survivorship. (Stip. ¶ 1(e)-(f); Pl. Ex. 6; Pl. Ex. 7.) Thus, there is no dispute that Plaintiffs now own Lot 7 by clear and undisputed title. *Page 1